[Civ. No. 19406.   First Dist., Div. Two.   Aug. 3, 1961.]

MARY ANN FAIRBAIRN, Appellant, v. NATHAN L. FAIRBAIRN et al., Respondents.

Appel, Liebermann & Leonard and Boekel, Moran & Morris for Appellant.

Bronson, Bronson & McKinnon for Respondents.

KAUFMAN, P. J.—Plaintiff, Mary Ann Fairbairn, appeals from a judgment against her in this action in which she unsuccessfully sued her former husband, Nathan L. Fairbairn, and the Nathan L. Fairbairn General Agency. She claims contrary to the findings and conclusions of the trial court that her husband was in a confidential relationship with her; that he fraudulently concealed community property; that the agreement is inequitable and requires reformation by the court after an accounting, and that she was entitled to the declaratory relief requested.

The parties were married on October 31, 1931. Two children, now living, were born of the marriage: Thomas L., born on September 20, 1933, and Cynthia, born on March 28, 1937. The parties separated in September 1951. Negotiations for a settlement of their property rights began shortly thereafter and continued for three years and two months.

The negotiations were conducted entirely and exclusively by and through the attorneys of the parties. Plaintiff never discussed the matter with the defendants or their attorney, but relied on and followed the advice of her attorney. She was also advised by a certified accountant from January 1953, to January 1955. The accountant testified that during this period, he consulted plaintiff's attorney constantly, sometimes twice a day, and saw the plaintiff six times. Plaintiff had many conferences and consultations with her attorney about the matter.

The agreement, signed on January 30, 1955, stated that differences had arisen between the parties as to what was community property and what was separate property, and that the agreement was to settle this as well as the other differences. Under the terms of the agreement, the plaintiff received, aside from her clothing and personal effects, a Cadillac automobile; some of the furnishings in the family home; all monies on deposit in her name; 25 shares of Nathan L. Fairbairn General Agency, of which 5 shares were to be immediately transferred to the defendant husband with the plaintiff retaining the right forever to receive all dividends, stock rights and benefits. The defendant husband agreed to bequeath these 5 shares to the plaintiff, or to the children if she predeceased

him; $100,000 in cash on the effective date of the agreement (the day of the entry of the interlocutory decree of divorce); $1,000 per month for her support for 11 years after the effective date of the agreement or until death or remarriage. The plaintiff was awarded custody of Cynthia, and $150 a month for her support during Cynthia's minority in addition to all reasonable and necessary medical expenses. After Cynthia's 21st birthday, the defendant husband agreed to deposit $150 a month in a trust account for her for a certain period. The defendant husband also agreed to bequeath $150,000 to Cynthia and Tom and to assume all the community debts.

The defendant husband received, aside from his clothing and personal effects, all the real property of the parties in Piedmont, 55 shares of the Nathan L. Fairbairn Agency, 4 insurance policies on his life whose principal amounts totaled $24,000, and any tax refunds for the year 1954. The furnishings of the family home were divided between the parties. The agreement also contained the usual provisions relating to debts, waiver, a special provision relative to the disposition of the Fairbairn General Agency stock, if the defendant husband divested himself of control of the corporation, provisions relating to taxes. The agreement also contained the provision set forth in the footnote below.* The parties also executed a supplemental agreement relating to the handling of certain tax matters.

The final decree of divorce was entered on February 4, 1956. On January 24, 1958, plaintiff filed this action. Her complaint was in four counts: the first sought declaratory relief as to several questions relating to the property settlement agree-

---

*"21. It is agreed and acknowledged by wife and husband that she and he, respectively, have been represented by independent counsel of her and his own choosing in all negotiations leading to the preparation and execution of this agreement, and that neither of the parties has relied upon any advice of the other. Each of the parties further acknowledges that her or his consent to the execution of this agreement has not been obtained by duress, menace, fraud or undue influence of any person. It is further expressly covenanted and agreed that no representations whatsoever have been made by either of the parties hereto to the other relative to the value of the property of the parties hereto, or any part thereof, and that neither of the parties has relied upon any statement or representation of the other, but that each of them has made an independent investigation of the respective properties belonging to the parties hereto and of the value thereof; and it is further covenanted and agreed by each of the parties with the other that this agreement is fair and just, and that each of them has executed the same in reliance solely upon her and his own independent investigation, and that of their respective counsel."

ment; the second alleged the fraudulent concealment of $14,500 of community property and a misrepresentation that dividends would be paid on plaintiff's stock; the third, misrepresentation that the defendant husband had separate property of $25,000 and by amendment the above mentioned allegation regarding dividends; the fourth count, to quiet title as to 20 shares of stock of the respondent husband. Nathan L. Fairbairn General Agency was eliminated by consent judgment. Plaintiff did not seek to have the property settlement agreement set aside, but prayed that the allegedly concealed community property be awarded to her and that the agreement be reformed to award her the $25,000.

The trial court filed an announcement of decision as follows: "The court hereby grants judgment for the defendants on the basis that the plaintiff has not met her burden of proof by a preponderance of the evidence. The court does not believe that the defendant was guilty of any fraud or concealment of community assets and, in any event, is persuaded that the doctrine enunciated in *Collins* v. *Collins,* 48 Cal.2d 325 [309 P.2d 420], is determinative of the issues tendered by the pleadings. The court is also of the opinion that there is no ambiguity in the language of the property settlement agreement which would require extrinsic evidence of the intention of the parties and that accordingly the agreement may be interpreted without the necessity of such proof. The court is of the further opinion that the count praying for reformation of the property settlement agreement is without basis in the record on the grounds that the parties contemplated the very possibilities that are complained of in this case and chose not to provide so in the agreement."

As to the first count for declaratory relief, the court found that there was a controversy as therein stated, but that it was not necessary to make findings declaring the rights of the parties with respect to the property settlement agreement under all of the circumstances. In its conclusions of law, the court determined that the plaintiff was not entitled to any relief as to the agreement and that it was binding on both parties; that the defendant husband was not guilty of any fraud in connection with the execution of the agreement, that no resulting trust was established, and that the plaintiff was not entitled to a reformation of the agreement, and entered judgment accordingly.

The contentions on this appeal from that judgment are as follows: (1) the trial court erred in basing its decision on

*Collins* v. *Collins, supra*; (2) the evidence does not support the judgment as it shows that the defendant husband was guilty of fraud as to $14,500 of the community property and misrepresented the extent of separate property and that he would cause dividends to be declared on the Fairbairn Agency stock; (3) that the trial court erred in denying her motion to present additional evidence, in failing to serve a copy of its proposed findings on the parties, and in failing to grant the declaratory relief requested.

The first argument is based on the trial court's statement in its announcement of decision that the doctrine enunciated in *Collins* v. *Collins*, 48 Cal.2d 325 [309 P.2d 420] is determinative of the issues tendered by the pleadings. In that case, both parties desired a divorce in order to remarry. The community property consisted of numerous parcels of real estate which Dr. Collins had acquired, the identities and values of which were unknown to Mrs. Collins; her Las Vegas attorneys requested a statement from Dr. Collins of the community property, which he refused to give. Mrs. Collins, contrary to the advice of her attorneys, and unaccompanied by them, returned to Los Angeles, made a settlement with Dr. Collins, notwithstanding his refusal of information as to the community property, and without renewing the request which her attorneys had made. The record disclosed that Mrs. Collins asked only for the home of the parties and a promise of support, which she received in the settlement; the home did not exceed in value $32,500; the properties in which she conveyed her interest to Dr. Collins had a value of about $174,000. In Mrs. Collins' suit for rescission, the trial court held that it was immaterial that Dr. Collins obtained a great advantage over his wife in the settlement and it was immaterial whether the agreement was a fair one, since Mrs. Collins received what she asked for. The court said (p. 329): ". . .'[U]nder the facts existing in this case, it is immaterial whether the property settlement agreement resulted in the defendant's receiving more of the community assets than the plaintiff received.' " Possibly the agreement which she signed did not constitute an equal or possibly even on the face of things a fair division of the community property. Yet it was what the plaintiff wanted, bargained for and accepted, other factors then possibly being more important to her. The record shows that the trial court undertook to determine the issue of the validity of the Collins settlement, *independently of any*

*question of fairness.* The case was tried and decided upon that theory. The trial court found that Mrs. Collins had *waived her right to a full disclosure of the community property.*

In affirming the trial court, the Supreme Court said, in part, at page 329: "Plaintiff, however, had ample opportunity to investigate, with the aid of independent counsel, the character and value of the property of the parties. Plaintiff had contemplated obtaining a divorce for some time before she made the property settlement agreement and obtained the divorce. Defendant did nothing to hinder her investigation of the property or to cause her to execute the agreement precipitately. Defendant owed plaintiff no duty to force her to investigate the properties when she announced that she was satisfied with the agreement prepared by defendant's counsel."

The above-quoted language concerning arm's length dealing between spouses, has been erroneously interpreted to mean that a husband and wife cease to be fiduciaries as soon as they become represented by attorneys, and from that time on they deal at arm's length, neither having a duty toward the other that would not be due to a stranger. (*Campbell* v. *Campbell,* 157 Cal.App.2d 548 [321 P.2d 133].) However, the *Collins* case did not hold that when a husband and wife undertake to negotiate a property settlement, each being represented by an attorney, the fiduciary relationship ceases to exist and that the parties deal with each other at arm's length; that under those circumstances a husband holding community property in his name need not make a full disclosure of the same with all relevant information known to him and unknown to his wife which might affect her judgment in the negotiations. The court simply held that there was sufficient evidence to support the trial court's finding that Mrs. Collins waived her right to receive from her husband complete information as to the extent and value of the community property and that she thereby released him from the duty to impart that information and thus terminated the fiduciary relationship.

Plaintiff further argues that the trial court misconstrued the *Collins* case and that the defendant husband here had the choice either to make full disclosure to her of everything she should know in order to contract, or to deal with her at arm's length. Plaintiff argues that since defendant husband made representations to her regarding their affairs, he thereby chose to make a full disclosure and that he meant to act as a fiduciary to her. However, as we have pointed out above, under the correct view of the *Collins* case, even though the confidential

relationship which existed because of the marriage has ceased, there still exists a fiduciary relationship as a matter of law. Of all the confidential relationships, that of a husband and wife is the most intimate, the most trusting and the most deserving of preservation; it touches the lives of most people; a husband may not at will discard his fiduciary relationship toward his wife whenever she is represented by counsel and settle with her for as little of the community property as she is willing to accept.

Our Supreme Court in *Vai* v. *Bank of America* (1961) 56 Cal.2d 329 [15 Cal.Rptr. 71, 364 P.2d 247], although holding that the *Collins* case was not applicable to the facts, reached the same conclusion as to the existence of the fiduciary duty of the husband with respect to his wife's interest in the community property under his control and management and held that the trial court had erred in its finding that the fact that the parties dealt at arm's length negated the existence of the fiduciary relationship. Thus, even if the trial court here erred in relying on *Collins* v. *Collins*, it was correct in its conclusion. There is, therefore, no merit in plaintiff's argument. *Vai* v. *Bank of America, supra*, does not help the plaintiff here because the facts as found by the trial court there showed constructive fraud as a matter of law. In the instant case, the facts are devoid of any such indication and the facts as found by the trial court here fully support the judgment.

Plaintiff first argues that the defendant husband was guilty of wasting $14,500 of their community property funds in an abortive and unconscionable attempt to obtain hoped for but nonexistent evidence that the plaintiff was of Negro blood and was illegitimate or in the alternative, that *if the testimony of defendant husband is not worthy of belief,* then during and after their property settlement negotiating, he deliberately concealed $14,500 of the community property and has not accounted to her for it. Defendant husband testified that he spent $14,500 in an investigation of his wife in October 1951. For this purpose, he employed an investigator who was paid in cash. He stated that he paid the first investigator who worked for about a month and a half $3,000 but could not remember his name; thereafter, there was an investigator named McCarthy. There were also three other investigators. One of these investigated the plaintiff's relatives and accompanied the defendant husband on a trip east. Plaintiff's argument is based primarily on the testimony of their son, Thomas,

who, as a witness for the plaintiff, testified that his father had told him his mother was illegitimate; that her father was a Negro and he was telling this to him for his own good so that he could have an operation in order not to have children; that his father told him he had two F.B.I. men go to Pennsylvania on this matter. The defendant husband testified he hired the investigators to find out what bank accounts his wife had and whether she had tried to sell the Fairbairn Agency while he was abroad. He testified that all the investigation reports had been destroyed, denied making statements against his wife, and stated that the purpose of his trip to Pennsylvania in 1953 was to find out whether the plaintiff had been previously married or divorced.

█ Contentions relating to the credibility of the witnesses and conflicts in the evidence are not properly raised before this court. These matters are within the exclusive discretion of the trial court and the only question on appeal is whether the trial court abused its discretion. █ As to the $14,500 spent on investigations, the trial court ruled that past expenditures by either spouse were outside the issues, which were concerned only with fraudulent concealment of community property at the time of the agreement. We do not think the trial court ruling was an abuse of discretion. The parties were separated; they were investigating each other and were negotiating a settlement of their differences with attorneys; they each spent community funds in protection of their interests. The expenditures were the regretable but normal consequences of their breach.

█ Plaintiff also argues that there is further evidence that the defendant husband deliberately concealed community assets and impoverished the community. She first points to a letter dated December 16, 1952, from the defendant to his attorney, which listed among his assets, an item showing $618 cash in the bank as of November 15, 1952. At the trial, the actual amount was shown to be $6,046.41. However, the item of $618 was taken from the bank books of the defendant husband and when the outstanding checks which had not yet cleared were subtracted from the total, the balance was found to be correct. █ Plaintiff also mentions the fact that the defendant husband had neglected to mention a savings account of approximately $1,000, although admitting it was nominal. However, as to this account, the defendant husband testified he was completely unaware of the account as it had not been active since 1941 with the exception of two deposits made in

1950. He had not made these deposits himself and the bank book had been lost.

■ Plaintiff further argues that defendant husband concealed $20,000, which he borrowed from Wells Fargo on May 8, 1951, and which was deposited in his checking account. The record showed that $21,129.26 was drawn from the account on May 15, 1951, by a check of the defendant husband. Plaintiff attempts to argue that this money was fraudulently used by the defendant husband. However, defendant husband stated that the check was payable to the Collector of Internal Revenue and was for income taxes for 1938 to 1943. This was corroborated by the stub in his check book. Plaintiff argues that the check stub is not satisfactory evidence. The trial court, however, found otherwise.

Plaintiff's next argument is that on June 25, 1951, defendant husband borrowed $10,000 from Wells Fargo; withdrew these funds by check the same day and that this transaction had been concealed. In April 1951, the defendant husband owed over $5,000 for articles which he had purchased for his wife at the Lakeshore Auction Gallery. The Nathan L. Fairbairn General Agency, which owned stock of Great Western, was about to sell a block of Great Western stock. Mrs. Downs, the defendant husband's then secretary and present wife, wanted to buy some of the Great Western stock. She, therefore, advanced to the defendant $5,000 which he used to pay the auction bill. He then borrowed $10,000 and on June 25, 1951, used the money to buy 500 shares of stock which he placed in the joint names of himself and Mrs. Downs. He also bought 50 shares of Great Western for himself and Mrs. Downs at this time from one Harry Isaacs. Thus, the defendant husband and Mrs. Downs owned 550 shares together. Aside from these 550 shares which he owned jointly with Mrs. Downs, the defendant husband also owned individually 105 shares, 80 of which had been acquired in the escrow transaction of 1948 and 25 which had been purchased from a Mr. McCormick in 1951.

In November 1951, defendant husband sold back to the agency 105 shares for $2,100. At the same time, the 550 jointly owned shares were sold to the agency, which paid Mrs. Downs $11,000. Mrs. Downs received the entire purchase price because she had purchased Mr. Fairbairn's interest in them by payments to him of $5,500 in October and November 1951.

■ Plaintiff next argues that defendant husband concealed the purchase of 5,000 shares of stock of the Great Western Fire and Marine Insurance Company. Defendant formed the Great Western in 1948. He bought the 5,000 preferred shares for the purpose of resale to friends. Pursuant to the permit, the shares and proceeds were placed in escrow with the Wells Fargo Bank. The purchase price of the shares was $100,000 which defendant husband borrowed from Wells Fargo. As he resold shares, he repaid Wells Fargo for the loan. Each time this occurred, the bank rendered to the corporation the certificate in defendant's name and obtained from the corporation a certificate in the name of the new stockholder for the number of shares purchased by the latter and issued a new certificate to defendant for the remaining shares held by him. The bank's loan card clearly showed the loan to defendant husband and its purpose. Plaintiff, however, argues, without merit, that the proceeds of the $100,000 loan have not been accounted for.

■ ■ Plaintiff's next major argument is that the defendant husband, with the intent to deceive and induce her to enter into the agreement, falsely represented that he would cause the Nathan L. Fairbairn General Agency to declare dividends on his stock and she relied upon these representations. Plaintiff relies on two letters from defendants' attorney to her attorney, the agreement itself, and testimony that the defendant husband had stated that no dividends would be paid as long as the plaintiff held any shares in the corporation. In one of these letters, it said that "it was possible within the next few weeks, the stock will begin to pay substantial dividends." The other said that "while the stock has substantial value, to date it has not paid any dividends but this does not mean that in the future, it will not pay." The only reference to dividends in the agreement is in respect to five shares which went to the defendant husband. As to these five shares, the agreement expressly reserves to the plaintiff the right forever to receive all dividends on stock, etc. Plaintiff's attorney testified it was understood no dividends were guaranteed at all and that he fully explained to her the federal law of undue accumulation of income; plaintiff's accountant testified he advised her to the same effect. The defendant husband testified that dividends would be paid in 1958 as otherwise the corporation would be penalized and that he never intended to deprive the plaintiff of any dividends.

It is clear from the above that there was substantial evi-

dence to support the trial court's findings that there was no fraud, either actual or constructive in the above transactions. We do not deem it necessary to examine in detail plaintiff's other similar contentions relating to various transactions undertaken for the alleged purposes of community impoverishment. It suffices to say there is evidence to support the trial court's findings.

Plaintiff next argues that she is entitled to an accounting, as an accounting will show fraud. However, she is entitled only to an accounting if there is fraud, and the trial court found none.

We turn now to plaintiff's remaining arguments: It is argued that the trial court erroneously refused plaintiff's request to present additional evidence on her motion for a new trial. In its minute order denying plaintiff's motion for a new trial, the court ordered certain affidavits and depositions stricken from the file. This request, which was made for the first time in plaintiff's closing trial brief, was denied by the trial court because in its opinion such evidence would only have been cumulative. The depositions in question are those of Donald DeCass and S. G. Clark, which, as they were on file with the clerk of the lower court, have now been made a part of the record on appeal by motion to augment. After examining these depositions, we are convinced that the trial court's conclusion was absolutely correct and that plaintiff's contention on this point borders on the frivolous.

The next argument is that the trial court erred to plaintiff's prejudice by signing the findings without the proposed findings having been served on the plaintiff as provided by section 634 of the Code of Civil Procedure. This section provides:

"In all cases where findings are to be made, a copy of the proposed findings shall be served upon all parties to the action and the court shall not sign any findings therein prior to the expiration of five days after such service. The court may direct a party to prepare findings.

"Within five days after such service any other party may serve and file objections, counter-findings and requests for special findings.

"If upon appeal or upon a motion under Section 657 or 663 of this code it appears that the court has not made findings as to all facts necessary to support the judgment, or that the findings are ambiguous or conflicting upon a material issue of fact, the court before which such appeal or motion is pending

shall not infer that the trial court found in favor of the prevailing party on such issue if it appears that the party attacking the judgment made a written request for a specific finding on such issue either prior to the entry of judgment or in conjunction with a motion under Section 663 of this code.''

The last two paragraphs were added in 1959. (Stats. 1959, ch. 637, § 2.) ▆▆▆ It is well established that the provisions regarding service of proposed findings are merely directory, and compliance therewith is not necessary to a validity of a judgment. (*Hathaway* v. *Ryan*, 35 Cal. 187; *Noland* v. *Noland*, 44 Cal.App.2d 780 [113 P.2d 11]; *Hahn* v. *Hahn*, 123 Cal.App.2d 97 [266 P.2d 519]; *Treat* v. *Superior Court*, 7 Cal.2d 636 [62 P.2d 147]; *Estate of Rosland*, 76 Cal.App.2d 709 [173 P.2d 830].) The reason for this view is that the purpose of the statute is to aid the courts in making proper findings of fact. The adverse party is given an opportunity to offer to the court the benefit of objections and suggestions. All that a party can expect at this point in the litigation is that a court shall make a proper set of findings. If the findings are insufficient, or are unsupported by evidence, or are defective in any other particular under the law, the injured party will be relieved on appeal. (*Amundson* v. *Shafer*, 36 Cal.App. 398, 401 [172 P. 173]; *Manfre* v. *Sharp*, 210 Cal. 479 [292 P. 465].)

▆▆▆ Plaintiff's reliance on the 1959 amendments to this section is not well founded, as these were designed to assure adequate review and remove the obstacle of the doctrine of implied finding (see 2 Witkin, California Procedure, 1959 Supp., § 118, pp. 166-167). It does not deal with the effect of a failure to serve proposed findings on the parties. Nor has the plaintiff made any showing of prejudice. ▆▆▆ In the absence of a showing of prejudice, failure to comply with the section will be disregarded on appeal (*Chamberlain* v. *Wakefield*, 95 Cal.App.2d 280 [213 P.2d 62]). ▆▆▆ Furthermore, the record does not show whether this matter was raised before the trial court. Such a failure may be a waiver (*San Jose etc. Title Ins. Co.* v. *Elliott*, 108 Cal.App.2d 793 [240 P.2d 41]).

Plaintiff's final argument is that the trial court's finding as to her first cause of action on declaratory relief was improper. The particular questions on which the plaintiff sought a declaration were: (1) whether in the agreement, the defendant husband warranted that he would cause dividends

to be declared; (2) whether the rights reserved by the plaintiff in the five shares include the right to any share issued in exchange for these shares in a recapitalization; (3) whether the defendant was obligated to pay certain medical bills for Cynthia; and (4) a group of questions relating to defendant husband's obligation to bequeath the stock and money.

As to the first question, the issue was disposed of by the court in its finding on the fraud issue and we have discussed it above. As to the second, the defendant husband admits that they do. As to the third question, the language of the agreement is clear and the answer of defendant husband admits he is obligated to pay all such bills as are reasonable and necessary. Furthermore, declaratory relief is not the proper remedy; if any of the reasonable and necessary bills are unpaid, plaintiff can obtain an order to show cause.

The final group of questions related to the defendant husband's obligation to bequeath stock to the plaintiff and a sum of money to the children. The plaintiff testified that she did not know of any will executed by the defendant. The defendant testified that he had executed a will pursuant to the agreement. Plaintiff sought to obtain from the trial court an indication that the will to be executed pursuant to the agreement would be irrevocable. However, as the trial court pointed out, the parties chose to handle the matter in such a way that this aspect of the defendant's obligations could not mature until his death, and if at that time the will had been revoked, there was still an enforceable contract, and plaintiff and the children have ample remedies at their disposal. An agreement in writing binding a person to make a particular disposition of his property by will is valid and equity will aid in its enforcement. (Civ. Code, § 1559, § 1624, subd. 6; *Sonnicksen* v. *Sonnicksen,* 45 Cal.App.2d 46, 53 [113 P.2d 495]; *Brewer* v. *Simpson,* 53 Cal.2d 567, 588 [2 Cal. Rptr. 609, 349 P.2d 289].)

Plaintiff further argues that the order of the trial court on this subject is defective because it does not say "at this time" and section 1061 of the Code of Civil Procedure states "The court may refuse to exercise the power granted by this chapter [declaratory relief] in any case where its declaration or determination is not necessary or proper at the time under all the circumstances." We can only conclude that the court properly declined to exercise its power.

In view of the foregoing, the judgment must be and it is hereby affirmed.

Draper, J., and Shoemaker, J., concurred.

A petition for a rehearing was denied September 1, 1961, and appellant's petition for a hearing by the Supreme Court was denied October 4, 1961.