ROTH, P. J.
 

 This appeal is from a judgment of dismissal predicated upon an order sustaining without leave to amend the demurrer of respondents to appellant’s complaint.
 

 Under settled rule
 
 (Schaefer
 
 v.
 
 Berinstein,
 
 140 Cal.App.2d 278, 288 [295 P.2d 113]) we must accept the allegations of the complaint (fourth amended in this case) as facts.
 

 Appellant Beatrice and decedent Elmer (respondents are the executors of Elmer’s estate) were married in 1925. Elmer departed in 1943 but continued to pay Beatrice $350 per month for the support of herself and their daughter until 1945. In the latter year, Elmer told Beatrice that he would provide for her and their daughter adequately if she got a lawyer, agreed to a written settlement of their property rights and sued for divorce, otherwise he would stop the $350 monthly payments entirely.
 

 Beatrice was in ill health, had suffered from severe arthritis since 1943 and “. . . being in fear of her personal health if she refused to accede ... to [Elmer’s] demands . . .” retained a lawyer. Negotiations were had for a period of many months. The negotiations did not jell rapidly enough for Elmer. He told Beatrice that unless she discharged her attorney and appeared at the office of his attorney for the purpose of promptly consummating a property settlement, that “he would make no further payments for [her] support
 
 *846
 
 and their minor child.” Beatrice thereupon discharged her lawyer and a property settlement was consummated in the office of Elmer’s lawyer.
 

 Beatrice says in her complaint:
 

 ”... During the negotiations preceding . . . the . . . [Settlement . . . decedent. . . his agents, . . . fraudulently and with intent to deceive . . . and to induce her to execute the . . . agreement, stated . . . :
 

 ”. . . he had certain oil leases and land standing in his own name, . . . said oil leases and land had little if any material value.
 

 ”... all .. . property in his name was heavily encumbered, ... it had little or no cash value, ... he had some cash income, . . . but ... he was unable to provide plaintiff with more than $350.00 per month for the support of herself and their minor child.''
 
 [1]
 

 Beatrice, as indicated, did as she was told. A settlement was executed. Beatrice obtained a default decree and the settlement was approved as part of the decree.
 

 Under the settlement, each party received certain items of tangible personal property. All of the other property consisting of real estate, oil leases, oil drilling equipment and chattels real except two Santa Barbara lots, went to Elmer.
 

 Beatrice, in addition to items of personal property and the two Santa Barbara lots, received $350 per month for four years for the support of herself and child. Upon the expiration of the four-year period or sooner, subject to the condition that Elmer would receive a credit of $100 per month against a sum of $70,000 for each monthly payment theretofore made, Elmer agreed to pay that amount, to wit: $70,000, into a trust fund for Beatrice. There was a further provision, that if he did not pay said sum into the trust fund, as required, he would transfer to the trust in lieu of money, one-half of all community property he received, less credits to which he might become entitled by reason of monthly payments he had theretofore made according to a formula set out in the settlement.
 

 
 *847
 
 ■ Approximately 51- pages of legal description were required in the appendix to the settlement to describe the properties acquired by Elmer.
 

 Beatrice says in her complaint: “From the inception of the marriage until its termination, decedent exercised complete •and exclusive control over all the business and financial transactions of the parties, including the community property which they acquired. Plaintiff, who was totally unskilled in property management, and who had no business experience or knowledge, took no part in the management of the community property, and she executed all deeds, notes and other documents presented to her relating to such property without questioning decedent’s motives or intentions. Decedent exercised complete domination over plaintiff in regard to such matters, and plaintiff reposed faith in the honesty, fair dealing and integrity of her husband. In all such matters between them a confidential relationship existed. ’ ’
 

 When in October 1949, it became necessary for Elmer to pay the $70,000 into the trust, (as the same had been diminished by the formula) he pleaded “. . . he had no money . . . ,” and requested a one-year extension. It was granted. When the extension had expired, Elmer again reiterated that he “. . . was still financially unable to make the required payment ...” and requested an extension until 1951. It was granted. In 1951, Elmer again pleaded inability. Beatrice then retained a lawyer and presumably as a consequence of the legal pressure then brought, Elmer paid $50,000 into the trust, the $70,000 having been discounted to that figure by reason of credits to which Elmer was entitled. Concurrently with the payment of the sum of $50,000, Elmer stated: “. . . that he had secured the money by borrowing it from his wife, Helen L. Boeseke.” Decedent and Helen were married that year.
 

 It appears from the sum of the allegations that Beatrice and Elmer had, during their 18 years of married life together, lived frugally. In 1936 each had been adjudicated and discharged as a bankrupt. Neither had received any property by way of gift, devise or bequest between 1936 and October 1945, the date of the settlement. Inferential!y, it appears that from the time Elmer separated from Beatrice, he continued to live frugally, at least until 1951. It is apparent, too, from what has already been said, that in 1949, 1950 and 1951, Elmer continued to represent that he was financially pressed to the
 
 *848
 
 point which rendered him unable to comply with the terms of the settlement.
 

 In 1951, Elmer remarried. Beatrice states : ”. . . his new wife being a person of wealth, . . . [she] had no way of knowing whether his manner of living was the result of his own income or that of his wife. ’ ’
 

 Elmer died in October 1963, at which time the daughter of Beatrice and decedent ”... initiated an inquiry as to whether decedent had left an estate, and whether she or her children would inherit anything.” She discovered that decedent had left a large estate and conveyed this information to plaintiff.
 

 ”... [P]laintiff made further inquiries, and for the first time learned from decedent’s former secretary that at the time of the execution of the . . . [s] ettlement . . . , the Texas leases, which decedent had listed only by legal description, were in fact producing large quantities of oil, and that decedent’s gross income from such oil production was approximately $8,000.00 per month; that the Wyoming leases listed in the agreement were, in fact, very valuable and were subsequently sold for
 
 $800,000.00,[
 

 2
 

 ]
 
 and that although the title of the Montecito property was encumbered, he had a large equity which was very valuable. ’ ’
 

 It becomes obvious from the foregoing recital that Beatrice prayed for a rescission of the settlement or in the alternative damages for fraud.
 

 The facts recounted demonstrate a fiduciary relationship between Beatrice and Elmer at the time of the settlement was made in law and in fact.
 

 Interpreting the high fiduciary relationship codified in section 158 of our Civil Code,
 
 [3]
 
 the courts have said there is a presumption of fraud if the husband obtains an advantage
 
 *849
 
 over his wife. It has been held and reiterated that if he does, “he must bear the burden of showing that the transaction was fair and just and fully understood by the party from whom the advantage was obtained.”
 
 (Estate of Cover,
 
 188 Cal. 133, 143 [204 P. 583].) To the same effect, see also
 
 Haseltine
 
 v.
 
 Haseltine,
 
 203 Cal.App.2d 48, 56 [21 Cal.Rptr. 238];
 
 Mergenthaler
 
 v.
 
 Mergenthaler,
 
 69 Cal.App.2d 525 [160 P.2d
 
 121]; Andrew
 
 v.
 
 Andrew,
 
 51 Cal.App.2d 451 [125 P.2d 47].)
 

 This high fiduciary relationship exists even though the wife is represented by separate counsel during the entire negotiation for a settlement.
 
 [4]
 

 Vai
 
 v.
 
 Bank of America,
 
 56 Cal.2d 329 [15 Cal.Rptr. 71, 364 P.2d 247];
 
 Clark
 
 v.
 
 Clark,
 
 195 Cal.App. 2d 373 [15 Cal.Rptr. 863];
 
 Fairbairn
 
 v.
 
 Fairbairn,
 
 194 Cal.App.2d 501 [15 Cal.Rptr. 548].)
 

 Assuming the evidence supports the allegations which we are bound to accept as fact, there can be little doubt that the facts outlined have the smell and complexion of fraud.
 

 The minute order sustaining the demurrer without leave is pregnant with the assumption that there was fraud. It recites that the complaint failed to allege that the facts constituting the fraud could not have been discovered earlier; why the facts could not have been discovered earlier; what effort was made to discover the facts earlier. In support of the ruling it cites
 
 Lady Washington Consol. Co.
 
 v.
 
 Wood,
 
 113 Cal. 482 [45 P. 809];
 
 Henigan
 
 v.
 
 Yolo Fliers Club,
 
 208 Cal. 697 [284 P. 906];
 
 Simpson
 
 v.
 
 Dalziel,
 
 135 Cal .599 [67 P. 1080].
 

 The rule set out in
 
 Lady Washington
 
 and the cases that follow it, however, is relaxed when there is no duty to inquire. In a fiduciary relationship such as exists between husband and wife, there can be no doubt that one spouse has the unquestioned right to rely upon the direct
 
 *850
 
 representations of the other and there is no duty of inquiry. Thus, in
 
 Hobart
 
 v.
 
 Hobart Estate Co.,
 
 26 Cal.2d 412, the court says at page 442 [159 P.2d 958]: “In the absence of a duty to make inquiry, as pointed out above, the statute does not run merely because the means of discovery were available, and plaintiff is not compelled to disprove that such means existed. He need only establish facts sufficient to show that he made an actual discovery of hitherto unknown information within three years before the filing of the action. ’ ’
 

 The rule set out in
 
 Hobart
 
 is explicitly applied in
 
 Bennett
 
 v.
 
 Hibernia Bank,
 
 47 Cal.2d 540, wherein the court says at page 563 [305 P.2d 20] : “Where there is no such duty, for example, because of the existence of a fiduciary relationship, a plaintiff need not disprove that an earlier discovery could have been made upon a diligent inquiry but need show only that he made an actual discovery of hitherto unknown information within the statutory period before filing the action. ’ ’
 

 The narrative set forth in the complaint shows that Beatrice regularly received her monthly payments until 1949. She was a sick woman who accepted and relied upon the representations of her husband. She and her daughter, the child of Elmer and herself, were living on a bare subsistence. Elmer in 1949, 1950 and 1951 reaffirmed the paucity of his means, when on these several occasions, he represented that he was financially unable to meet the trust provisions of the settlement. Respondents argue that this circumstance should have alerted Beatrice to make inquiries because the settlement provided that if Elmer did not pay the money into the trust, he must transfer to the trust one-half of the community property he had received. Conceding arguendo, as respondents contend, that at that time the husband and wife status and the fiduciary relationship between the two no longer existed, the effect of Elmer’s reiterated plea of financial inability was not to create suspicion of Elmer’s duplicity but rather to fortify the original representations Elmer and his agents made and which Beatrice had relied upon, when without counsel, she permitted Elmer and his lawyer to persuade her to accept the settlement made in October 1945. Further, when in 1951, Elmer paid $50,000 into the trust' as required by the settlement, only after Beatrice had engaged a lawyer to compel him to do so, with the concurrent statement that he borrowed it from his new wife, it .would appear to a more sophisticated person than Beatrice that Elmer' had 'made accurate representations as to the status of the community
 
 *851
 
 property at the time of the settlement. On the other hand, if the narrative set out in the complaint is proved, it would appear that Elmer had embarked upon a course of conduct calculated not only to mislead Beatrice into executing the settlement, but one which would discourage even a suspicious thought in the mind of Beatrice that she had been taken advantage of.
 

 Conceivably the inference raised by the complaint that in 1951 decedent changed his style of living, might have alerted Beatrice. However, her pleading justifies her lack of attention to this circumstance by the allegation that Elmer married a wealthy woman and she had no way of telling whether this change was due to his wealth or the wealth of his new wife. Since Elmer had affirmatively stated that he borrowed $50,000 from his new wife to meet his obligations under the settlement, it is fair to assume that his new standard of living was not a circumstance which should have aroused suspicion and ignited an investigation.
 

 The facts show, too, that in 1951, Beatrice employed an attorney to obtain for her that to which she was entitled under the settlement. It may be that alert and aggressive counsel would at that time have done more and would have launched an investigation on his own. It may be that such an investigation would have disclosed the facts discovered in 1963. Analyzed realistically, however, the facts show that the attorney was employed by a woman with small means, who so far as the record discloses, did not remotely suspect that she had been cheated. In fact, as we have pointed out, the bare allegations indicate that there was a calculated effort on Elmer’s part to prevent her from becoming suspicious. In these circumstances, it is understandable how the average competent practitioner would be infected by the immediate needs of his client and would consider that the full measure of his responsibility was that for which he had been specifically retained, to wit: to obtain for his client the fruits of a settlement she had made.
 

 Finally, the discovery was made in the most natural manner and in itself almost demonstrates the complete reliance of Beatrice on Elmer’s representations and her complete lack of suspicion at any time thereafter that there was anything wrong with it.
 

 Elmer having died, his daughter by Beatrice, now married and with children of her own, who were Elmer’s grandchildren, commenced to satisfy a curiosity completely proper.
 
 *852
 
 She initiated a natural inquiry to discover whether she or her children were remembered by her father in his will. The size of the estate she discovered and reported to her mother caused Beatrice to investigate that which she had never suspected needed investigation. She acted promptly when significant facts were brought to her attention.
 

 The point of the demurrer to Beatrice’s complaint was, of course, the statute of limitations grounded upon section 338, subdivision 4 of the Code of Civil Procedure.
 
 [5]
 
 The
 
 Lady Washington
 
 case and the
 
 Bennett
 
 case and many of the others cited construe that section.
 

 In our opinion, whether
 
 Lady Washington
 
 rule or the one announced in
 
 Bennett,
 
 applies, the facts outlined satisfy the requirements of each. Given the same factual background, it would make no difference if the action had been filed at the end of four years after the settlement, or at the end of 40, as long as it was promptly filed after discovery.
 

 Beatrice is entitled to the opportunity to go forward with her ease and respondents are entitled to defend. In overruling the.demurrer, we, of course, express no opinion on the merits of the case, nor do we pass on the truth or falsity of any of the facts which have been pleaded, nor do we consider the effect of any facts which might be pleaded by the defendants. We merely decide that the present complaint on its face states a cause of action.
 

 The judgment is reversed and respondents are directed to answer within such time as may be fixed by the trial court.
 

 Herndon, J., and Fleming, J., concurred.
 

 A petition for a rehearing was denied December 12, 1967, and the opinion was modified to read as printed above. Bespondents’ petition for a hearing by the Supreme Court was denied January 11, 1968.
 

 [1]
 

 On this facet of the case the settlement recited: ”6. The parties hereto have acquired certain personal property and equities in certain real property and leases of an indefinite and speculative value; that neither party makes any representations to the other as to the value of the community or other property or with respect to any property; that each party relies upon his or her own investigation and judgment with respect to all property and all matters herein contained; that this agreement is made and entered into by each of the parties of his and her own volition and that each of the parties has read, or heard read, the whole of this agreement.”
 

 [2]
 

 Respondents urge that the pleading does not indicate whether those figures are net or gross and that there is no allegation indicating when oil was discovered. The demurrer did embrace these uncertainties. However, as indicated, the pleading before us must be liberally construed. This principle is supplemented by the additional rule that facts peculiarly within the knowledge of an adversary may be pleaded on information or belief or omitted on the strength of such an allegation.
 
 (CampbellKawannanakoa
 
 v.
 
 Campbell,
 
 152 Cal. 201 [92 P. 184];
 
 Lewis
 
 v.
 
 Beeks,
 
 88 Cal.App.2d 511 [199 P.2d 413];
 
 Schaake
 
 v.
 
 Eagle etc. Can Co.,
 
 135 Cal. 472, 485 [63 P. 1025, 67 P. 759];
 
 Bank of America
 
 v.
 
 Vannini,
 
 140 Cal.App.2d 120, 120 [295 P.2d 102].)
 

 [3]
 

 Section 158.
 
 “Husband and wife may make contracts.
 
 Either husband or wife may enter into any engagement or transaction with the other, or with any other person, respecting property, which either might if unmar
 
 *849
 
 ried; subject, in transactions between themselves, to the general rules which control the actions of persons occupying confidential relations with each other, as defined by the Title on Trusts. ’
 
 ’
 

 [4]
 

 Respondents argue that on October 19, 1945, after the settlement had been executed, Beatrice re-employed the same lawyer to obtain the default divorce who had previously conducted negotiations for her and whoni she discharged upon Elmer’s order, and that when the interlocutory decree was granted on November 16, 1945, the lawyer asked for approval of the settlement. Respondents, citing 39 Cal.Jur.2d 35 and
 
 Bainbridge
 
 v.
 
 Stoner,
 
 16 Cal.2d 423 [106 P.2d 423], insist that the court take judicial notice of these facts. We do not agree that the complaint can be enlarged in this manner. These facts, if relevant, aré matters of 'defense.
 
 (Talbot
 
 v.
 
 City of Pasadena,
 
 28 Cal.App.2d 271 [82 P.2d 483].) Further, in view of
 
 Vai
 
 and the many cases which reiterate the doctrine of
 
 Vai,
 
 we think said facts are material only on the issue of reliance on .representation made.
 

 [5]
 

 Code of Civil Procedure, section 338, subdivision 4, states: “An aetioii for relief on the ground of fraud or mistake. The cause of action in such ease not to be deemed to have accrued mitil the discovery, by the aggrieved party, of the facts constituting the fraud or mistake. ’ ’