211 N.J. Super. 432 (1986)
511 A.2d 1257
JOHN Z. DELOREAN, PLAINTIFF,
v.
CRISTINA DELOREAN, DEFENDANT.
Superior Court of New Jersey, Chancery Division Somerset County, Family Part.
Decided April 10, 1986.
*434 John J. Trombadore for plaintiff (Schachter, Cohn, Trombadore & Offen, attorneys).
David M. Wildstein for defendant (Wilentz, Goldman & Spitzer, attorneys).
IMBRIANI, J.S.C.
This matrimonial case examines the circumstances under which an antenuptial agreement may be enforced and whether that issue may be resolved by arbitration. The intent of most marriages is to create an "indivisible union of one" in which both spouses generally contribute whatever they own prior to the marriage or acquire thereafter into a common marital fund. Upon death the survivor usually receives whatever has been accumulated but, if a divorce ensues, in the usual case they share all marital assets equally.
However, when parties enter into an antenuptial agreement their purpose is to alter that usual arrangement and enter into an economic partnership whereby many or all of the assets owned prior to the marriage or acquired thereafter are not contributed into a common marital fund but are kept segregated *435 and, when the marriage ceases, whether by death or divorce, they are not shared equally but pursuant to a plan conceived and agreed upon before the marriage was consummated. It is important that we understand that normally the intent of most antenuptial agreements is to deny a spouse an interest in assets held in the sole name of the other which the former would ordinarily receive by operation of law when the marriage ceased.
These parties entered into an antenuptial agreement on May 8, 1973 (only a few hours before they married) which provided that:
any and all property, income and earnings acquired by each before and after the marriage shall be the separate property of the person acquiring same, without any rights, title or control vesting in the other person.
The potential assets could exceed $20 million and practically all of them are in the sole name of the husband. Absent this agreement and considering that this is a thirteen-year marriage in which there are two minor children, under New Jersey law this wife could reasonably have anticipated receiving approximately 50% of the marital assets at the time of divorce. But if this agreement is upheld she will receive relatively little. She asserts that this agreement should not be enforced because (1) she was not provided with a full and complete disclosure of her husband's financial affairs before she signed it and (2) undue influence was exerted upon her by her husband who possessed far greater financial knowledge and experience than she.
Initially, it is clear that "antenuptial agreements fixing post-divorce rights and obligations [are] ... valid and enforceable" and courts should "welcome and encourage such agreements at least `to the extent that the parties have developed comprehensive and particularized agreements responsive to their peculiar circumstances'." D'Onofrio v. D'Onofrio, 200 N.J. Super. 361, 366 (App.Div. 1985). In determining whether to enforce an antenuptial agreement there are at least three requirements that have to be met.
*436 First, that there was no fraud or duress in the execution of the agreement or, to put it another way, that both parties signed voluntarily. The wife alleges she did not sign voluntarily because her husband presented the agreement to her only a few hours before the marriage ceremony was performed and threatened to cancel the marriage if she did not sign. In essence she asserts that she had no choice but to sign. While she did not have independent counsel of her own choosing, she did acknowledge that before she signed she did privately consult with an attorney selected by her husband who advised her not to sign the agreement. Yet, for whatever reasons, she rejected the attorney's advice and signed.
While her decision may not have been wise, it appears that she had sufficient time to consider the consequences of signing the agreement and, indeed, although she initially refused to sign it, after conferring with her intended spouse and an attorney, she reconsidered and decided to sign it. Concededly, the husband was 25-years older and a high powered senior executive with General Motors Corporation, but she was not a "babe in the woods." She was 23-years old with some business experience in the modeling and entertainment industry; she had experienced an earlier marriage and the problems wrought by a divorce; and she had advice from an attorney who, although not of her own choosing, did apparently give her competent advice and recommended that she not sign. While it may have been embarrassing to cancel the wedding only a few hours before it was to take place, she certainly was not compelled to go through with the ceremony. There was no fraud or misrepresentation committed by the husband. He made it perfectly clear that he did not want her to receive any portion of the marital assets that were in his name. At no time did she ever make an effort to void the agreement and, of course, it was never voided. Under these circumstances the court is satisfied that the wife entered into the agreement voluntarily and without any fraud or duress being exerted upon her.
*437 Second, the agreement must not be "unconscionable." This is not to say that the agreement should be what a court would determine to be "fair and equitable." The fact that what a spouse receives under an antenuptial agreement is small, inadequate or disproportionate does not in itself render the agreement voidable if the spouse was not overreached and entered into the agreement voluntarily with full knowledge of the financial worth of the other person. See 41 Am.Jur.2d § 298. So long as a spouse is not left destitute or as a public charge the parties can agree to divide marital assets in any manner they wish. Marschall v. Marschall, 195 N.J. Super. 16, 30-31 (Ch.Div. 1984). Mrs. DeLorean presently enjoys substantial income from her employment as a talk-show television hostess and was given a life interest in a trust of unknown amount created by Mr. DeLorean, which he testified had assets of between $2 and $5 million dollars.[1] She will not be left destitute. The court is unaware of any public policy which requires that the division of marital assets be made in what the court believes to be fair and equitable if the parties freely and voluntarily agree otherwise. In the final analysis it is for the parties to decide for themselves what is fair and equitable, not the court. So long as a spouse had sufficient opportunity to reflect on her actions, was competent, informed, and had access to legal advice and that of any relevant experts, a court should not, except in the most unusual case, interject its own opinion of what is fair and equitable and reject the wishes of the parties. Since the wife voluntarily agreed to this division of the marital assets and she will not become destitute or a public charge, the agreement is not unconscionable.
Third, the spouse seeking to enforce the agreement made a full and complete disclosure of his or her financial wealth *438 before the agreement was signed. Obviously, one cannot make a knowing and intelligent waiver of legal and financial rights unless fully informed of all of the facts; otherwise one cannot know what is being waived. The husband asserts that the wife acknowledged that she received a full and complete disclosure of his financial wealth because the agreement states:
Husband is the owner of substantial real and personal property and he has reasonable prospects of earning large sums of monies; these facts have been fully disclosed to Wife.
However, that statement is not very meaningful and is insufficient to satisfy his obligation to make a full and complete disclosure of his financial wealth. While several states hold that a full and complete disclosure is not synonymous with a detailed disclosure, see e.g., Lopata v. Metzel, 641 P.2d 952 (Sup.Ct.Colo. 1982), those cases can be distinguished because they impose upon each spouse a duty to inquire and investigate into the financial condition of the other. However, as far as this court can ascertain, New Jersey imposes no such duty.
A conflict arose as to precisely what financial information was disclosed by Mr. DeLorean. However, the court is satisfied that even if it accepted as true the testimony of Mr. DeLorean he did not satisfy his legal obligation to make a full and complete disclosure. But we should address the question of how to avoid disputes of this nature in the future. It is clear that we can ascertain with complete certainty whether there was a full and complete disclosure only by requiring a written list of assets and income be attached to the antinuptial agreement. Anything less will encourage a plethora of plenary hearings which would frequently be complicated by contradictory and conflicting testimony, often tainted by memory lapses. Research has disclosed, for reasons not clear to this court, several cases in which the suggestion of a written list has been rejected, Roberts v. Estate of Roberts, 664 S.W.2d 634 (Mo. App. 1984); Hengel v. Hengel, 122 Wis.2d 737, 365 N.W.2d 16 (App. 1985).
*439 Our purpose must be to fashion a rule which will avoid litigation. As said in Brandenburg v. Brandenburg, 83 N.J. 198 (1980):
the complexity of the many issues facing a matrimonial court call for rules that possess some degree of certainty and ease of application. [at 207]
Obviously, a rule which relies upon the testimony of the parties and their witnesses of what was said and done many years ago will not do so and, in fact, will result in considerable litigation.
It is interesting to note that when our Supreme Court was confronted in Brandenburg with the issue of when to fix the termination of a marriage so as to determine when marital assets should be valued for equitable distribution purposes (an issue that arises in practically all cases), the court rejected procedures that relied upon oral testimony and held that it shall be either the date of the filing of the complaint or an earlier date if there was a written property settlement agreement and the parties lived in separate habitations. This simple rule predicated on a written document has avoided a tremendous amount of litigation. That same philosophy should be adopted here.
While the wife was aware that Mr. DeLorean was a person of substantial wealth, there was no way that she could have known with any substantial degree of certainty the extent of his wealth. This is important because one can appreciate that while a wife might waive her legal rights to share in marital assets of $1 million, she might not be willing to do so if she knew the marital assets were worth $20 million. And the suggestion that Mrs. DeLorean had a duty to investigate to ascertain the full nature and extent of his financial wealth is both unfair and unrealistic. How many people when about to marry would consider investigating the financial affairs of their intended spouse? How many people would appreciate or tolerate being investigated by an intended spouse? And how many marriages would be cancelled when one of the parties is informed of an investigation being conducted by the other? Such *440 a requirement would cause embarrassment and impose a difficult burden. The better rule is that the:
burden is not on either party to inquire, but on each to inform, for it is only by requiring full disclosure of the amount, character, and value of the parties' respective assets that courts can ensure intelligent waiver of the statutory [and other] rights involved. [Rosenberg v. Lipnick, 377 Mass. 666, 389 N.E.2d 385, 388 (Sup.Ct.Mass. 1979).]
When a spouse has a duty to fully and completely disclose his financial wealth we would eviscerate and render meaningless that duty if we imposed upon the other spouse a duty to investigate.
The only way that Mrs. DeLorean could knowingly and intelligently waive her legal rights in Mr. DeLorean's assets was if she was fully and completely informed what they were. And for Mr. DeLorean to merely state that he had an interest in a farm in California, a large tract of land in Montana, and a share in a major league baseball club fell far short of a full and complete disclosure. If this issue were decided under New Jersey law the court would conclude that Mr. DeLorean did not make a full and complete disclosure of his financial wealth before his spouse signed the antinuptial agreement and, therefore, it would not be valid and enforceable.
However, it is argued that California, not New Jersey, law should be applied. The parties married and executed the agreement in California. It is hornbook law that when an agreement is silent as to which law should be applied, the validity and construction of a contract shall be determined by the law of the place of contracting. Colozzi v. Bevko, Inc., 17 N.J. 194 (1955); Chaudry v. Chaudry, 159 N.J. Super. 566 (App.Div. 1978); Restatement, Conflict of Law, § 332 (1934). But this agreement is not silent and expressly provides that it:
shall be construed under the laws of the State of California and enforceable in the proper courts of jurisdiction of the State of California.
When the agreement was executed the parties had substantial contacts with California and reasonably expected to retain many of them which, indeed, has been the case. For these reasons the law of California must be applied in this case.
*441 That being so, what duty does California law impose upon a party to an antenuptial agreement with regard to the disclosure of one's financial wealth? In both California and New Jersey fiduciaries are required to exercise a high degree of trust, good faith and candor in their dealings with each other.
[T]he person occupying a position of trust, has the burden of showing affirmatively that no deception was practiced ..., that no undue influence was used, and that all was fair, open and voluntary as well as understood. [Petruccio v. Petruccio, 205 N.J. Super. 577, 580 (App.Div. 1985); emphasis supplied]
Where California and New Jersey law part is in their determination of what constitutes a fiduciary because, unlike New Jersey, California does not treat a party to an antenuptial agreement as a fiduciary on the theory that "parties who are not yet married are not presumed to share a confidential relationship." Marriage of Dawley, 17 Cal.3d 342, 355, 131 Cal. Rptr. 3, 551 P.2d 323 (1976). So long as the spouse seeking to set aside such an agreement has a general idea of the character and extent of the financial assets and income of the other, that apparently is sufficient in California. Indeed, absent fraud or misrepresentation, there appears to be a duty to make some inquiry to ascertain the full nature and extent of the financial resources of the other. See Boeseke v. Boeseke, 255 Cal. App.2d 848, 63 Cal. Rptr. 651 (1967). As this court reads California law, the disclosures made by John DeLorean appear to be sufficient for purposes of enforcing this agreement.
And this court does not have to rely solely upon its review of California law because here we have the benefit of a decision by a retired California judge, (see infra), who also was of the opinion that the disclosures made by John DeLorean were sufficient. Accordingly, the court is satisfied that under California law there was a sufficient disclosure by the husband and the antenuptial agreement of May 8, 1973 is valid and enforceable.
*442 There is another and perhaps even more compelling reason why this agreement must be enforced. Initially, Mrs. DeLorean filed suit for divorce in California and was granted a divorce there. About the same time that she filed her divorce complaint, Mr. DeLorean filed a suit for divorce in New Jersey and he asked this court to assume jurisdiction of the matrimonial dispute because the wife was not a resident of California for six months before she filed her complaint in California as is required by California law. Following a plenary hearing this court ruled on July 3, 1985 that the California proceeding (including the California judgment of divorce) was invalid because Mrs. DeLorean was not a resident of California for six months before she filed her complaint for divorce in California and held that jurisdiction lies with the New Jersey courts since it was here the parties resided for several years.
Nonetheless, thereafter, on July 10, 1985 (only a week later) both parties, while being represented by both California and New Jersey counsel, voluntarily consented in a formal, three-page agreement to have retired California Judge Lester A. Olson "hear and try the issue of the validity of the Prenuptial Agreement." A hearing commenced before him on July 15, 1985 in which both parties testified in their own behalf, were subjected to cross-examination, and presented witnesses. Promptly thereafter, on July 18, 1985, in a formal, five-page decision Judge Olson upheld the validity and enforceability of the agreement. It is urged by the husband that those proceedings constituted an arbitration proceeding and under New Jersey law both parties are bound by his decision.
It is really astonishing that although the Arbitration Act was adopted in 1923, see N.J.S.A. 2A: 24-1, et seq., its use has been generally limited to resolve labor and commercial disputes. However, the immense rise of other types of legal disputes has caused our courts to explore its use in other areas as well. Only recently the Supreme Court mandated its use to resolve certain automobile law suits. See R. 4:21A.
*443 Arbitration is a consensual, voluntary contract entered into by parties to a dispute for the purpose of securing a "final disposition in a speedy, inexpensive, expeditious, and perhaps less formal manner of [one or more of] the controversial differences between the parties." Barcon Associates v. Tri-County Asphalt Corp., 86 N.J. 179, 187 (1981). Arbitration offers many benefits: it reduces the length and cost of the court process, it enables the parties to select their own judge who they believe has the ability, fairness and expertise to render a just decision, and the dispute can frequently be resolved in a private forum in which the decision, absent an appeal, will not become a public record.
However, there are at least two significant disadvantages. First, the arbitrator is not bound by the usual rules of evidence and, second, there is limited appellate review because an "award is not to be cast aside lightly. It is subject to being vacated only when it has been shown that a statutory basis justifies that action." Kearny PBA Local # 21 v. Town of Kearny, 81 N.J. 208, 221 (1979).
N.J.S.A. 2A:24-8 permits an arbitrator's award to be vacated only under four limited circumstances: if (a) "procured by corruption, fraud or undue means," (b) the award displays "evident partiality or corruption in the arbitrators," (c) the arbitrators refused to hear pertinent and material evidence or committed other prejudicial "misbehaviors," or (d) the arbitrator exceeded or imperfectly executed his powers so that a mutual, final and definitive award was not made. No such misconduct exists here and, therefore, the arbitrator's decision must be upheld.
As noted in Ukrainian Nat. Urban Renewal v. Muscarelle, Inc., 151 N.J. Super. 386 (App.Div. 1977):
[t]he essence of arbitration is that, by agreement of the parties, the arbitrators decide both the facts and the law ... An arbitrator's factual ... [and] legal conclusions may be scrutinized only to determine whether one or more of the criteria of N.J.S.A. 2A:24-8 is fulfilled. [at 396]
*444 Crutchley v. Crutchley, 306 N.C. 518, 293 S.E.2d 793 (1982) perceptively noted that a:
mistake committed by an arbitrator is not of itself sufficient ground to set aside the award. If an arbitrator makes a mistake, either as to law or fact, it is the misfortune of the party, and there is no help for it. There is no right of appeal, and the Court has no power to revise the decisions of `judges who are of the parties own choosing'. [293 S.E.2d at 797]
Do parties to a pending lawsuit in New Jersey have the right, without the authorization or knowledge of the court, to submit one or more legal and factual issues to a third party whose determination would be binding upon them in their lawsuit? This court is unaware of any requirement that the designation of an arbitrator must be made by the court or with its knowledge and approval. And the question whether arbitration should be allowed in a matrimonial action was affirmatively resolved in Faherty v. Faherty, 97 N.J. 99 (1984) where a property settlement agreement was incorporated into a judgment of divorce and the court said:
[i]t is fair and reasonable that parties who have agreed to be bound by arbitration in a formal, written separation agreement should be so bound. Rather than frowning on arbitration of alimony disputes, public policy supports it ... In this sensitive and intensely private area of domestic disputes, arbitration expressly contracted for by the spouses is highly desirable. [at 107-108]
These principles of law apply with equal force to a case involving an antenuptial agreement.
In this era of explosive matrimonial litigation the need for adoption of alternate dispute resolution is self-evident. And while the incidence of antenuptial agreements is now minimal, one could reasonably anticipate that with the increasing frequency of remarriages resort to their use will occur more often. Under these circumstances use of arbitration to resolve disputes arising from such agreements will have a significant beneficial impact on the court case load and should be encouraged.
I do not view Judge Olson, as does Mrs. DeLorean, as a judge who is part and parcel of what this court ruled to be an invalid California proceeding, but as an arbitrator who the parties *445 voluntarily selected to decide an important issue in their New Jersey divorce suit. Indeed, since the antenuptial agreement specifically provides in paragraph eight that it "shall be construed under the laws of the State of California" there was obvious logic in having a retired California judge pass upon that issue.
The parties are bound by his decision and the antenuptial agreement of May 8, 1973 is valid and enforceable in New Jersey.
NOTES
[1] Actually the testimony of the husband was vague, if not evasive, about the content and value of the trust fund and it appeared that the wife was unaware that she possessed a life interest in a trust fund until he disclosed that information during his testimony in court.