**TRUCKING EMPLOYEES OF NORTH JERSEY WELFARE FUND, INC.,
Appellant,**

v.

**Robert COLVILLE.**

**No. 93–5230.**

United States Court of Appeals,
Third Circuit.

Argued Nov. 1, 1993.
Decided Feb. 4, 1994.

---

**2.** At the beginning of the trial, Judge Goettel had observed that "this is borderline as to whether it should be prosecuted."

Herbert New (argued) Herbert New & David W. New, P.C., Clifton, NJ, for appellant.

Alan C. Antonucci (argued), Cedar Grove, NJ, for appellee.

Before: BECKER and STAPLETON, Circuit Judges, and RESTANI, Court of International Trade Judge.*

## OPINION OF THE COURT

RESTANI, Judge.

This matter is before the court following our remand to the United States District Court for the District of New Jersey to consider *Velis v. Kardanis*, 949 F.2d 78 (3d Cir.1991), with respect to appellant's garnishment of appellee's bank account containing disability benefits. *Trucking Employees of North Jersey Welfare Fund, Inc. v. Colville*, 986 F.2d 1410 (3d Cir.1993) (*"Colville III"*). The district court found *Velis* inapplicable to the facts of this case. This appeal ensued and we now reverse on the basis of *Velis*.

## I.

Appellee, Robert Colville, is a beneficiary of appellant, Trucking Employees of North Jersey Welfare Fund, Inc. ("the Fund"). The Fund is a health, welfare, and pension plan as defined in the Employee Retirement Income Security Act, ("ERISA"), 29 U.S.C. § 1002(1), (2) (1988). On October 1, 1980, the Fund began paying Colville disability benefits of $500 per month. Colville was advised on July 20, 1982, that October 1981 was the last month for which he was entitled to receive Social Security disability benefits.

According to Section 4.6(d) of the pension plan, termination of Social Security disability benefits also triggers the termination of Fund disability payments. *See Trucking Employees of North Jersey Welfare Fund, Inc., v. Colville*, Civ. Action No. 89–5162, at 3 (D.N.J. May 28, 1991) (*"Colville I"*), Appellant's Appendix ("App.") at 23. Although Colville was a union shop steward, and had in his possession booklets that explained the

---

* Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designa-   tion.

plan terms, he did not notify the Fund that his Social Security benefits had terminated. The Fund did not learn of the termination until February 1989, at which time Fund disability payments to Colville were discontinued. Colville refused to reimburse the $44,000 in overpayments that he had received. The Fund then commenced withholding Colville's early retirement benefits.

The Fund brought the instant action in the United States District Court for the District of New Jersey for restitution of the overpayments. Colville counterclaimed for release of his retirement benefits. On May 28, 1991, the district court granted the Fund judgment in the amount of $44,000 plus interest, but declined to place a constructive trust on the withheld benefits in favor of the Fund. *Colville I*, at 10, App. at 30. Further, the district court, *sua sponte*, ordered release of the withheld funds. *Id.* at 12, App. at 32. No appeal was taken from this judgment.

The released funds were deposited in Colville's personal bank account. On March 2, 1992, pursuant to the request of the Fund, a writ of execution was served on the account. On April 27, 1992, the district court denied the Fund's motion for turnover of the account funds, *see Trucking Employees of North Jersey Welfare Fund, Inc. v. Colville*, Civ. Action No. 89–5162, at 6, (D.N.J. Apr. 27, 1992) ("*Colville II*"), App. at 51, and the first appeal herein was taken. As indicated, this court remanded the case to the district court for consideration of *Velis*, which the parties had not brought to the attention of the district court previously. *Colville III*, at 4–5, App. at 18–19. The district court did not find *Velis* to be controlling and again declined to order turnover. *Trucking Employees of North Jersey Welfare Fund, Inc. v. Colville*, Civ. Action No. 89–5162, at 3 (D.N.J. Apr. 12, 1993) ("*Colville IV*"), App. at 5.

## II.

We have appellate jurisdiction under 28 U.S.C. § 1291 (1988) to review the final order of the district court. The district court had jurisdiction pursuant to 29 U.S.C. § 1132(e) (ERISA) (1988) and 28 U.S.C. § 1331 (1988). We exercise plenary review, as the only issues before us are legal in nature. *Williams v. New Castle County*, 970 F.2d 1260, 1264 (3d Cir.1992).

## III.

At issue in this appeal is the scope of ERISA's anti-alienation provision, which states: "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1) (1988). The district court's first opinion denying turnover of funds construed § 1056(d)(1) to bar recovery of overpayments, and was based largely on the holding in *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990), *decision after remand rev'd*, *Guidry v. Sheet Metal Workers Int'l Ass'n, Local 9*, 10 F.3d 700 (10th Cir.1993). *Colville II*, at 2–4, App. at 47–49.

In *Guidry,* the Supreme Court, relying on § 1056(d)(1), invalidated a constructive trust placed on pension benefits for the purpose of recovering funds embezzled from a union by one of its officers. 493 U.S. at 372–74, 110 S.Ct. at 685–86. Because the source of the misappropriated funds was the union, and not the union's pension fund, the Court reasoned that no fiduciary duty to the pension plan had been breached. *Id.* at 373–74, 110 S.Ct. at 685–86. The Supreme Court thus found it unnecessary to determine whether remedial provisions contained in § 409(a) of ERISA superseded ERISA's anti-alienation provision.[1] *Id.* at 373, 110 S.Ct. at 685. The Court further determined that it was inappropriate to create a generalized equitable exception to the anti-alienation provision on the basis of employee misfeasance or criminal misconduct. *Id.* at 376, 110 S.Ct. at 687.

Citing to its unappealed opinion in *Colville I*, the district court stated that under *Guidry*, the anti-alienation provision "erects a general bar to the garnishment of pension

---

1. Section 409(a) of ERISA, 29 U.S.C. § 1109(a) (1988), provides that a pension plan fiduciary who breaches his duty to the plan, "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach ... and shall be subject to such other equitable or remedial relief as the court may deem appropriate."

benefits from plans covered by ERISA." *Colville II*, at 2, App. at 47. The district court then concluded that the monies in Colville's personal bank account were essentially the same funds as those covered by the anti-alienation provision. Thus, the court held the funds continued to be protected for the same reasons as if they had remained undistributed. *Id.*, at 5, App. at 50.

▆ We have recognized, in *Velis v. Kardanis,* however, a difference between funds remaining in the possession of an ERISA plan trustee and funds that have been distributed to the beneficiary. 949 F.2d at 82. In *Velis,* pension and Keogh plan assets had been partially distributed to a debtor under Chapter 11 of the Bankruptcy Code. *Id.* at 80. More specifically, the debtor in *Velis* had "borrowed" funds from these sources to purchase two cooperative apartments in which his medical practice was located. *Id.* We determined in *Velis* that these borrowed funds were beyond the protection of the anti-alienation provision, and therefore were within the debtor's estate pursuant to 11 U.S.C. § 541 (1988). *Id.* at 82–83.

Subsequent to our decision in *Velis,* the Supreme Court, in *Patterson v. Shumate,* — U.S. —, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992), reaffirmed its holding in *Guidry,* concluding that the anti-alienation provision was an enforceable restriction with respect to the bankruptcy estate of a pension plan beneficiary. *Patterson,* — U.S. at —, 112 S.Ct. at 2250. Neither *Guidry* nor *Patterson,* however, specifically addressed distributed funds, such as those at issue in *Velis.*

After consideration of the *Velis* opinion, the district court found it to be inapplicable to the facts of this case. *Colville IV*, at 5–7, App. at 7–9. The district court reasoned that the essential difference between the two cases was the use of the distributed funds in *Velis* for investment purposes. *Colville IV,* at 5, App. at 7. Quoting *Patterson,* — U.S. at —, 112 S.Ct. at 2250, the district court noted that the anti-alienation provision reflected the Congressional policy choice to "safeguard a stream of income for pensioners (and their dependents, who may be, and usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them." *Colville IV*, at 6, App. at 8.

We, on the other hand, do not find the reasoning of *Velis* to be limited solely to the situation where funds have been distributed and then immediately invested in non-liquid assets. The distinction the district court draws in finding *Velis* inapplicable to the facts presented here appears to be unworkable. Investments, as opposed to more readily accessible funds, such as those in a bank account, may or may not be a source of a stream of income that could be used for current living expenses that was envisioned in *Patterson.* Under the theory employed by the district court, would annuity or dividend-paying stock investments be subject to the anti-alienation provision, or would they be subject to execution and claims of creditors in bankruptcy? The reasoning of the district court leaves this question unanswerable. Accordingly, we reject the narrow view of *Velis* adopted by the district court.

▆ Additionally, the Court of Appeals for the Tenth Circuit recently reached the same conclusion as we reach here. Following remand by the Supreme Court, the pension benefits at issue in *Guidry* were paid into a bank account opened specifically to receive these funds. *Guidry,* 10 F.3d at 704. The creditor union garnished the bank account to satisfy a judgment against the pension beneficiary based on embezzlement of union funds. *Id.* at 703–704. The Tenth Circuit concluded that the anti-alienation provision, as interpreted by Department of Treasury regulations, applies only to actions against the plan, not to actions against the beneficiary. *See id.* at 709–710, 716.

The particular regulation at issue, 26 C.F.R. § 1.401(a)–13(c)(1), defines an assignment or alienation as:

[a]ny direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all or any part of a plan benefit payment which is, or may become, payable to the participant or beneficiary.

26 C.F.R. § 1.401(a)–13(c)(1)(ii) (1992). Although the Tenth Circuit found that the regulation, to a degree, undermines Congress' desire to ensure that pension beneficiaries actually receive benefits for retirement purposes, the court also found that the regulation was consistent with one interpretation of the less than clear language of the anti-alienation provision. *Guidry*, 10 F.3d at 710–712. The regulation construes the statute to forbid alienation of rights to future payments, rather than alienation of the actual money paid out. *See id.* at 710. The Tenth Circuit upheld the regulation as a reasonable interpretation of the statute by the agency charged with administering it. *Id.* at 711–713; *see Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (where an agency's construction of a statute it administers is "permissible," such interpretation will be upheld); *Facchiano Constr. Co. v. U.S. Dep't. of Labor*, 987 F.2d 206, 213 (3d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 80, 126 L.Ed.2d 48 (1993) (courts must give substantial deference to agency construction of a statutory scheme by the agency that has been entrusted with its administration).

Not having the benefit of the Tenth Circuit's opinion in *Guidry*, 10 F.3d 700, the district court in the instant case did not address this reasoning on remand. Rather, the court discussed in detail only one clause of the regulation, which provides in part:

> [t]he terms "assignment" and "alienation" do not include ... (iii) [a]ny arrangement for the recovery by the plan of overpayments of benefits previously made to a participant.

*Colville IV*, at 7, App. at 9 (citing 26 C.F.R. § 1.401(a)–13(c)(2)(iii) (1992)). The district court determined this clause was inapplicable because it applied only to funds still in the hands of the pension trust. *Id.* at 7–8, App. at 9–10. The court also noted that it found the entire regulation to be so restricted. *Id.* at 8, App. at 10. Whatever the applicability of clause 13(c)(2)(iii), the Treasury Department and the Tenth Circuit have found the regulation as a whole, and particularly 26 C.F.R. § 1.401(a)–13(c)(1), to address broad-er issues, including the one now before this court. We agree with their view.

Another potentially instructive decision, and one to which the parties here cite extensively, is *Coar v. Kazimir*, 990 F.2d 1413 (3d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 179, 126 L.Ed.2d 138 (1993), decided in the week following the district court's opinion in *Colville IV*. In *Coar*, a former trustee of a pension fund breached his fiduciary duty to that same fund. 990 F.2d at 1414. The pension fund then attempted to recoup from the fiduciary's pension benefits the losses occasioned by his misconduct. *Id.* at 1414–15. The district court in *Coar* prohibited recoupment by means of equitable setoff, based upon its construction of the anti-alienation provision. *Id.* at 1415. We reversed, finding *Guidry* inapplicable where ERISA's remedial provision, § 409(a), is brought into play. *Id.* at 1420.

The majority in *Coar* stated that the anti-alienation provision, and *Guidry*, shield "only the beneficiaries' interest under the pension plan from third-party creditors." *Id.* at 1420–21. The concurring opinion in *Coar* would have expressly limited the holding to breaches by fiduciaries. *See id.* at 1425. We need not address the breadth of *Coar*, or the competing policies discussed therein in order to resolve this matter. The district court's order resulting in payout of the funds in this case was never appealed. As the funds are no longer in the hands of the pension plan trustee, *Velis*, rather than *Coar*, controls.

## IV.

For the foregoing reasons, the judgment of the district court will be reversed, and the case will be remanded for the district court to order turnover of the account funds that are the subject of execution of the appealed judgment.