132 F.3d 37
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carol J. LAMPIEN, Defendant-Appellant.
 No. 96-3337.
 United States Court of Appeals, Seventh Circuit.
 Submitted April 22, 1997.*
Dec. 31, 1997.
 
 Before ESCHBACH, MANION and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Carol Lampien appeals from a restitution order entered by the district court on remand from this Court. Lampien pleaded guilty to a charge of embezzling funds from an insurance company in violation of 18 U.S.C.A. § 1033(b)(1)(A). When the district court first sentenced Lampien, it ordered her to, among other things, make restitution in the fill amount that she was charged with embezzling, some $ 498,972.94. As part of that restitution, the district court ordered Lampien to quitclaim her home to the victim of her embezzlement, Wausau Insurance Company, to make a lump sum payment in a certain amount, and to make monthly payments over a certain period of time until she had returned the entire amount. We agreed with Lampien on appeal that the district court had exceeded its authority in ordering her to quitclaim her home to Wausau, and in setting her monthly payments higher than could be justified by the presentence investigation of her assets. See United States v. Lampien, 89 F.3d 1316 (7th Cir.1996).
 
 
 2
 As a result of further investigation and civil contempt proceedings triggered by Lampien's failure to make restitution during the pendency of her first appeal, the parties and the court had a more accurate assessment of the resources from which Lampien could make restitution when we remanded her case for resentencing By that time, it was known that, among other assets, Lampien held jewelry valued at nearly $ 400,000, and that she was heir to her mother's home which was valued at approximately $ 90,000 With this new information, and consistent with a settlement agreement that Lampien had entered into with the government on May 16, 1996 to resolve the civil contempt proceedings (R. 79), the district court again ordered Lampien to make full restitution. Anticipating a shortfall from the sale of the jewelry and Lampien's mother's house, the court also ordered Lampien to make payments of $600 per month while in prison and $300 per month after release. R. 88 at 5. R. 89 at 14. In calculating the amount that Lampien could afford to pay while in prison, the court noted that Lampien's home was an asset that could be used to generate rental income of about $ 450 per month. R. 88 at 5, R. 89 at 13. At the time, Lampien's adult son was living in the home rent-free, purportedly maintaining the property as a favor to his mother. Over Lampien's objection (R. 89 at 16-17), the court ordered "that in the event the real estate's present occupant Terry Lampien, defendant's son, refuses to pay rent for his occupancy the defendant shall immediately make arrangements for the rental of said real estate to someone other than her son beginning not later than December 1, 1996." R. 88 at 6; see also R. 89 at 18-19.
 
 
 3
 Lampien challenges the order that she either collect rent from her son or in the alternative lease the house to a third party, arguing that the Victim and Witness Protection Act. 18 U.S.C. §§ 3663-3664 ("VWPA")[1] does not grant the court the authority to require this of her. She also argues that nothing in the presentence investigation supports the district court's determination that the house has rental value of at least $450 monthly and that in fact the court's assessment is in all probability excessive given what the record reveals about the condition of the house.[2]
 
 
 4
 The limited terms of the VWPA again compel us to reverse the restitution order in part.
 
 
 5
 We concluded in the prior appeal that "a district court is limited to effecting the enforcement of a restitution order only as expressly provided by the VWPA." 89 F.3d at 1322. We vacated the order requiring Lampien to quitclaim the interest in her residence to Wausau because we found nothing in the VWPA authorizing that particular means of enforcing Lampien's restitution obligation. Id; see also United States v. Comer, 93 F.3d 1271, 1281-82 (6th Cir.), cert. denied, 117 S.Ct. 595 (1996). In defending the new restitution order, the government has cited no authority permitting a court to require a defendant to employ her home as a rental property, nor do we find such permission in the VWPA The judgment is therefore invalid to this extent.
 
 
 6
 We agree with the district court. however. that the reasonable rental value of Lampien's home, in appropriate circumstances, could be considered in ascertaining her ability to make monthly payments in satisfaction of her restitution obligation. The statute directs the court, in determining whether to order restitution and in what amount, to consider among other things "the financial resources of the defendant," the "earning ability of the defendant," and "such other factors as the court deems appropriate" 18 U.S.C. § 3664(a). The rental income that reasonably may be derived from property available for lease by the defendant may be considered as one of her financial resources, and thus may be factored into her ability to make restitution. Therefore, although the court lacks the power to order Lampien to rent her home, it still may consider the income that Lampien reasonably could earn through the rental of her home while incarcerated in deciding what payments she can presently make in restitution. Lampien remains free not to charge her son rent or to lease her home to a third party; however, her decision not to access the reasonable rental value of her home would not relieve her of the obligation to make any monthly payments that the district court has properly found her capable of making based in part on the income reasonably available to her from this financial resource.
 
 
 7
 Having said that, we are troubled by the paucity of evidence in the record supporting the district court's determination that Lampien's home had a rental value of $450 per month. The record does reveal that the two-bedroom, one-bath house has a market value of $58,900. Attributing monthly rental income of $450 to such a home would not seem unreasonable, particularly where, as here, the court assumed that Lampien would continue to pay for most or all of the utilities at the house during her incarceration R. 88 at 5-6. On the other hand, nothing in the record reveals what rent one can expect to pay for a comparable home in Milwaukee, and nothing confirms that Lampien's home is actually in a marketable condition. Several months after Lampien was re-sentenced, her son testified in a civil contempt proceeding that he could expect to pay § 400 if he had to rent another home or apartment and that a dwelling rented at that amount was not likely to be as "good" as his mother's home. R. 120 at 14. Mr. Lampien estimated that he would have to pay $700 "maybe" for a comparable home. Id. Taken at face value, his testimony would tend to confirm the reasonableness of the rental value that the court had previously attributed to the house. By no means does Mr. Lampien have any expertise about the housing market in Milwaukee, however, on the contrary, he has lived in his mother's home rent-free for virtually his entire life. R. 120 at 3-4.[3]
 
 
 8
 Moreover, and perhaps more importantly, the record casts some doubt on the viability of Lampien's home as a rental property. The probation officer who inspected Lampien's home prior to sentencing, although noting that the home was neatly furnished and generally well-kept, reported a "very strong odor of cats" emanating from the basement that Lampien was attempting to combat (with evidently limited success) using an electric potpourri pot. R. 94, Letter dated Aug. 15, 1995 from Probation Office Michelle E. Watts to Probation Officer Clark J. Rodgers, at 2. Terry Lampien confirmed in the civil contempt proceedings that the house had a "slight[ ]" cat odor (as well as plumbing problems in the kitchen and other parts of the house). R. 120 at 8. Historically, at least, the odor has been much more than a "slight" one. The Pre-Sentence Report states:
 
 
 9
 Available records reflect the defendant's lifestyle has drawn civil attention in the City of Milwaukee. The May 19, 1994 Milwaukee Journal-Sentinel reports the City of Milwaukee filed a suit claiming Ms. Lampien['s] home was giving off "horrendous and unbearable" odors from cat wastes. From 1987 to 1994, Ms.
 
 
 10
 Lampien received 17 municipal tickets for refusing entry to health inspectors, violation of the city odor ordinance, and having too many unlicensed animals in a residence. The Milwaukee City Health Department verified this information.... R. 94 pp 55. Whatever steps Lampien and her son may have taken to eliminate the odor in the wake of the lawsuit and the many citations,[4] the PSR and Terry Lampien's testimony make plain that the problem was not yet solved. In the absence of any evidence in the record confirming that the house is in a condition amenable to rental, we cannot simply assume that a reasonable person would in fact be willing to pay $450 per month to rent a home that had once been so foul-smelling as to trigger a lawsuit by the city and which, as of the date a probation officer inspected it, continued to give off a "very strong" odor that an electric potpourri warmer could not overcome.
 
 
 11
 Without the income attributed to the prospective rental of her home, the record suggests that after paying the expenses that the district court approved, Lampien would have at most $415 per month to pay toward restitution while she remains incarcerated. Consequently, the judgment cannot stand insofar as it requires her to make monthly payments of $600 during this period. We therefore vacate the sentence in this respect and remand for further proceedings consistent with this order. Because the record reveals that the sale of Lampien's assets (in particular, the jewelry appraised at nearly $400,000) has yielded much less money than the parties hoped it would, the court should reconsider on remand whether complete restitution remains a reasonable prospect at this juncture. Nothing in this order, however, should be construed as precluding the district court on remand from imposing a new monthly-payment obligation that is consistent with Lampien's financial resources and needs as well as the terms of this order.
 
 VACATED AND REMANDED
 
 
 *
 This successive appeal has been submitted to the original panel pursuant to Operating Procedure 6(b). After reviewing the briefs and the record, the panel is unanimously of the view that oral argument is unnecessary Accordingly, the appeal has been submitted on the briefs and the record alone. See Fed R App P 34(a), Circuit Rule 34(f)
 
 
 [1]
 The provisions of the VWPA were amended by Title II of the statute known as the Antiterrorism and Effective Death Penalty Act of 1996. However, the amendments only apply to sentencing proceedings for defendants convicted on or after April 24, 1996, the effective date of the AEDPA. See 18 U.S.C.A § 2248 note (West Supp.1997); United States v. Wilson, 98 F.3d 281, 284 n. 6 (7th Cir.1996) As Lampien was convicted in 1995, we apply the pre-amendment version of the VWPA
 
 
 [2]
 In her reply brief, Lampien asserts for the first time that the district court abused its discretion in establishing the amount of her monthly restitution payments based in part on the § 920.69 she receives each month in pension benefits. She argues that the anti-alienation provision of the Employee Retirement Income Security Act, 29 U.S.C.A. § 1056(d)(1), bars any order compelling her to make restitution from these funds. See United States v. Smith, 47 F.3d 681, 683-84 (4th Cir, 1995). Whether pension benefits may be reached for such ends as restitution once the benefits have been distributed to the beneficiary is a question that has divided the circuits. Compare Smith (a 2-1 opinion) with Guidry v. Sheet Metal Workers Nat'l Pension Fund, 39 F.3d 1078, 1081-83 (10th Cir1994) (en banc), cert. denied, 514 U.S. 1063, 115 S.Ct. 1691 (1995); Trucking Employees of N. Jersey Welfare Fund, Inc. v. Colville, 16 F.3d 52, 55-56 (3d Cir.1993) We need not address this question. which was raised neither below at sentencing nor in Lampien's opening brief Given the conflict of authorities and lack of a controlling precedent from this circuit, any error in considering Lampien's pension benefits as a financial resource from which she can make restitution was by no means plain
 We acknowledge that Lampien did subsequently raise the issue below in connection with her efforts to convince the district court to reconsider holding her in civil contempt for her failure to comply with the restitution order we are reviewing in this appeal. Lampien has separately appealed two of the court's orders denying the requests for reconsideration of the civil contempt finding, and we have disposed of those appeals today by separate order. See United States v. Lampien, Nos. 97-1740, 97-3656 (7th Cir. Dec. 31, 1997).
 
 
 [3]
 Mr. Lampien apparently did live in his grandmother's home (again, rent-free) for a short period of time
 
 
 [4]
 A letter from Lampien's counsel submitted in connection with the original pre-sentence investigation indicates that "the suit was dropped by the City with no concessions on [Lampien's] part." R. 94, Letter dated Sept. 5, 1995 from attorney Brendan J. Rowen to Hon. John C. Shabaz, at 1